CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY

2024 NOV -5 P 12:19

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.<br><br>*ex rel.* [UNDER SEAL],<br><br>Plaintiffs,<br><br>v.<br><br>[UNDER SEAL],<br><br>Defendants. | **Civ. Action No. ______________**<br><br>**COMPLAINT**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)2**<br><br>**JURY TRIAL DEMANDED** |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JOHN DOE,<br><br>Plaintiffs,<br><br>v.<br><br>INFINITY BIOLOGIX, LLC d/b/a SAMPLED<br><br>Defendants. | **Civ. Action No. ______________**<br><br>**COMPLAINT FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)2**<br><br>**JURY TRIAL DEMANDED** |

## *QUI TAM* COMPLAINT

Relator John Doe ("Relator"), on behalf of the United States, brings this action against Infinity Biologix, LLC d/b/a Sampled ("Defendant" or "IBX") for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA").

## INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States under the False Claims Act ("FCA"), 31 U.S.C. § § 3729-3733, in connection with IBX's submission of false claims to the Government for reimbursement for COVID-19 testing services.

2. From at least July 2020 through March 2022 (the "Relevant Time Period"), Defendant IBX, "a leading next-generation central laboratory providing sample collection and processing, storage, analytical services, and scientific and technical support," systematically defrauded the patient enrollment system for the federal program that reimbursed health care providers furnishing COVID-19 testing to uninsured persons (the "Uninsured Program") by fabricating patient names and billing the Government for tests it did not provide.

3. During the COVID-19 crisis, the Federal Government funded the Uninsured Program to support COVID-19 testing of uninsured individuals by eligible healthcare providers across the United States.

4. While the tens of billions of dollars in funding were undoubtedly necessary to ensure uniform and continuous testing of a large segment of the U.S. population (approximately 25.6 million people), it also became a target for opportunistic providers to implement creative schemes to generate huge amounts of ill-gotten wealth.

5. One such opportunistic provider was IBX. For close to two years, IBX submitted false and fraudulent claims to the Uninsured Program with impunity by enrolling thousands of fabricated patients into the Uninsured Program and billing for non-existent services to those fake patients.

6. To effectuate its scheme, IBX created over a dozen "dummy" uninsured patients across different counties with at least 50 different identities enrolled. Some patient names had over a hundred different entries in the system, each purportedly being tested multiple times over the course of the Relevant Time Period.

7. In one particularly brazen example, IBX registered 120 patients under the same name from different states and zip codes with different genders. That patient's first name is [redacted] and last name is [redacted] Other patient names that were repeated dozens of times included "[redacted]

8. Needless to say, the creation of fake names and the submission of claims for services not rendered was material to the claims for payment and is a violation of the FCA.

9. Even assuming that the names are real, which they are not, IBX clearly submitted, or caused to be submitted, ineligible and fraudulent claims to the Uninsured Program for COVID-

19 testing to persons who had health coverage on the relevant date of the service. Indeed, IBX billed for more uninsured individual patients from certain zip codes than the total population for those zip codes.

10. For example, IBX enrolled and billed for 565 individual patients for the zip code 55111, a section of Fort Snelling, Minnesota. But, census data shows that as of 2022, the total population in that zip code is only 100. In other words, the IBX enrolled uninsured population in this zip code is 5 times larger than the population itself. This pattern is repeated across numerous zip codes.

11. By knowingly disregarding its obligation to only seek reimbursement from the Uninsured Program for eligible COVID-19 testing, Defendant IBX fraudulently obtained hundreds of millions of dollars from the Government.

12. IBX started as an academic biorepository by Rutgers University. After the outbreak of COVID-19, the need for biological sample storage dwindled, and IBX (then the Rutgers University Cell and DNA Repository or "RUCDR") pivoted. Led by Dr. Andrew Brooks, a team of scientists developed a saliva the "first to market" COVID-19 saliva test to receive Emergency Use Authorization from the FDA in April 2020.

13. In August 2020, following the success of the newly developed test, IBX was spun out of Rutgers to become an independent entity, raising $44 million from Viking Global Investors.

14. The spin-out occurred shortly after developing the "first to market" COVID-19 saliva test to receive Emergency Use Authorization from the FDA in April 2020.

15. The extraordinary profits obtained by IBX through the fraudulent scheme came at the expense of the public treasury and, ultimately, patients who lacked health insurance. Defendant's fraudulent scheme drained limited funds appropriated by Congress to cover COVID-

19 testing costs for uninsured persons. In March 2022, the Government announced that it would stop accepting claims for reimbursement for COVID-19 testing due to a lack of sufficient funding.

16. In sum, IBX violated the FCA by falsely billing the Government for reimbursement on COVID-19 testing through the Uninsured Program. This action seeks to recover tens of millions of dollars (or more) for the Government in connection with those violations.

## PARTIES

17. The United States is the real party of interest in this action.

18. Relator John Doe 1 is an employee of Optum Technology ("Optum") at UnitedHealth Group ("UHG").

19. Defendant IBX is a corporation headquartered in Piscataway, New Jersey.

## JURISDICTION AND VENUE

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732.

21. This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in the District of New Jersey.

22. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant can be found in, resides in, and/or has transacted business in the District of New Jersey.

23. Relator knows of no other FCA complaints that have been filed against Defendant alleging the same or similar actions for the Relevant Time Period. Additionally, Relator is an original source, as defined in 31 U.S.C. § 3730(e)(4)(B). Relator made voluntary disclosures to the United States before filing this lawsuit.

## STATUTORY BACKGROUND

### I. The Uninsured Program

24. In response to the public health emergency caused by the global COVID-19 pandemic, Congress enacted various legislation to ensure that persons in the United States could receive COVID-19 testing at no cost to themselves. Congress carefully delineated who would cover the cost of this testing. For individuals with private health insurance coverage, Congress mandated that private health insurers cover these persons' medically necessary COVID-19 testing. *See* Families First Coronavirus Response Act (the "FFCRA"), Pub. L. No. 116-127, 134 Stat. 178, 201 (2020) *as amended by the* Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281, 366-367 (2020). Congress similarly required that government health care programs, such as Medicare or Medicaid, cover medically necessary COVID-19 testing for persons enrolled in such programs. *See* FFCRA, Pub. L. No. 116-127, 134 Stat. 178, 202-208 (2020).

25. For the remaining individuals who did not have health insurance coverage (approximately 8.6% of persons in the United States), Congress appropriated finite sums of funding that permitted HHS to reimburse health care providers that provided COVID-19 testing to persons who did not have any health care coverage on the relevant date of service ("Uninsured Individuals"). *See* FFCRA, Pub. L. No. 116-127, 134 Stat. 178, 182, 206 (2020); Paycheck Protection Program and Health Care Enhancement Act (the "Paycheck Protection Act"), Pub. L. No. 116-139, 134 Stat. 620, 626 (2020); CARES Act, Pub. L. No. 116-136, 134 Stat. 281, 563 (2020); American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4, 236 (2021).

26. Health Resources and Services Administration ("HRSA"), an agency within the United States Department of Health and Human Services ("HHS"), established and administered the Uninsured Program, formally titled the *COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured*. In

order to protect the integrity of the program, HRSA mandated that any providers seeking reimbursement from the Uninsured Program agree to specific Terms and Conditions, and make attestations regarding their compliance with specific program requirements.

27. HRSA contracted with UHG to help administer the Uninsured Program.

28. Upon enrollment, when a patient indicated that he or she did not have health insurance, he or she was required to provide his or her social security number, driver's license, or state ID number in order to confirm insurance information.

29. The submission of claims to the Uninsured Program involved several steps, and providers were required to use two systems. First, though an online portal known as the "UIP Portal," health care providers had to enroll in the Uninsured Program and submit a "patient roster." The patient roster contained identifying information regarding the providers' uninsured patients, including the patient's birthdate and the patient's gender. In order to upload any patient roster, however, the provider had to make attestations to HRSA regarding these patients (the "Patient Roster Attestations").

30. The Patient Roster Attestations included a representation from the provider that they had "checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for COVID-19 testing or care for the patient." *See* Ex. A (Patient Roster Attestations).

31. Further, in the Patient Roster Attestations, the providers had to attest that they had read and agreed to the Uninsured Program's Terms and Conditions ("Terms and Conditions"). Those Terms and Conditions (which were linked and available on the Uninsured Program's website) specifically prohibited providers from seeking reimbursement for COVID-19 testing that: (1) had

been provided to patients who had any health care coverage at the time the services were provided; or (2) would be (or had been) reimbursed by another payor. The Terms and Conditions also contained the following statement:

> The Recipient certifies that all information it provides as part of its application for the Payment, as well as all information and reports relating to the Payment that it provides in the future at the request of the Secretary or Inspector General, *are true, accurate and complete, to the best of its knowledge*. The Recipient acknowledges that *any deliberate omission, misrepresentation, or falsification of any information contained in a request for reimbursement or future report may be punishable by criminal, civil, or administrative penalties,* including but not limited to revocation of Medicare billing privileges, exclusion from federal health care programs, and/or the imposition of fines, civil damages, and/or imprisonment.

32. Through their agreement to the Terms and Conditions, providers also acknowledged their ongoing obligations, as well as the materiality of their compliance. *See id.* ("The Recipient acknowledges that each time the Recipient submits such claims for reimbursement, each claim must be in full compliance with these Terms and Conditions, and submission of those claims confirms the Recipient's ongoing compliance with these Terms and Conditions. The Recipient acknowledges that the Recipient's full compliance with all Terms and Conditions is material to the Secretary's decision to disburse funds to the Recipient. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made.")

33. After a provider attested to compliance with these program requirements and submitted its patient roster, UHG (on behalf of HRSA) performed patient insurance eligibility checks for patients whose Social Security Numbers had been included in patient rosters submitted by providers to attempt to identify individuals with health insurance coverage. HRSA established the following policies regarding these patient insurance eligibility checks for UHG to follow. If UHG's eligibility check did not identify health insurance for an individual on a patient roster, UHG would assign the patient a Temporary Patient ID. Conversely, if UHG found that a patient included

in a roster had insurance, it would not issue a Temporary Patient ID.

34. Claims for COVID-19 testing submitted to the Uninsured Program that were not accompanied by a valid Temporary Patient ID would be rejected. Providers could then submit claims for reimbursement to the Uninsured Program by using the Temporary Patient IDs issued by UHG in claims submissions made through the Medicare Electronic Data Interchange, a system widely used by health care providers.

35. The Uninsured Program generally reimbursed providers at rates published by the Centers for Medicare and Medicaid Services ("CMS"), which published Healthcare Common Procedure Coding System ("HCPCS") codes that were used in providers' electronic claims submissions to the Uninsured Program. Through these HCPCS codes, the providers identified the specific services rendered. The Uninsured Program reimbursed providers as much as $100 for providing a COVID-19 test, and an additional $23.46 for the collection of specimens.

36. HRSA also provided ongoing guidance to providers. For example, HRSA published "Frequently Asked Questions" ("FAQs") and corresponding answers on the Uninsured Program's website, such as the following FAQ about Uninsured Individuals:

> ***Who is considered to be an "uninsured individual" for purposes of providers requesting reimbursement for testing, treatment, or vaccine administration?***
>
> For claims for COVID-19 testing and testing- related items and services, treatment of positive cases of COVID-19, and vaccine administration claims, a patient is considered uninsured if the patient did not have any health care coverage at the time services were rendered.

HRSA, *FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration FAQs* (published May 2021).

37. Further, the Uninsured Program's website informed providers, that if they make direct contact with the patients, the provider should make its own "best efforts to confirm that the patient was uninsured."

38. The Uninsured Program could only reimburse providers using the funds that had been appropriated by Congress. On March 16, 2022, HRSA informed providers that, on March 22, 2022, the Uninsured Program would stop accepting new claims for COVID-19 testing and treatment due to a lack of sufficient funds.

## II. The False Claims Act

39. The FCA establishes civil penalties and treble damages liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1).

40. "Knowingly" is defined to include actual knowledge, reckless disregard, and deliberate ignorance. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *Id.*

41. In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or false claim. *Id.* at § 3729(a).

# SPECIFIC FACTUAL ALLEGATIONS

## I. IBX Takes Advantage of a Public Health Crisis

42. In March 2020, the global pandemic necessitated an extensive partnership between private industry and public institutions to respond to unprecedented demand COVID-19 testing.

43. In furtherance of this effort, state governments contracted with provide healthcare providers, like IBX, to operate testing sites across the country to meet this demand.

44. Over the course of the next two years, IBX billed the Government for over $124 million in tests to over 800,000 purportedly uninsured patients. The underlying claims data for these tests confirms that many of them were illegitimate and the claims for payment associated with them fraudulent.

## II. Defendant's Fraudulent Billing Practices

### A. The UHG Claims Data

45. The federal government contracted with UHG to be the sole administrator of the COVID-19 Uninsured Program. In this capacity, UHG maintained the portal through which patients were enrolled by providers, processed the claims submitted by the provider, submitted the claims to the Government by providers, and issued payments to the providers when they were made by the Government. Accordingly, UHG maintained all of the claims data related to the Uninsured Program.

46. The data confirms that millions of claims were fraudulently submitted for uninsured patients, for tests that were not performed, and for tests that were purportedly performed on people that do not exist.

47. The following chart shows the Top 11 states by population, according to 2022 census data. In those states, the number of uninsured patients for whom claims were submitted far exceeded the number of uninsured in those states in all cases, and even exceeded the total population in several of those states.

| State | Total # of Uninsured Patients Submitted | Total # of Uninsured members with Claims | State Pop - Uninsured Non-elderly (0-64) - 2022 | Overall State Pop - NST-EST2021 | % of Uninsured Members with Claims against State Uninsured | % of Uninsured Members with Claims against State Population |
|---|---|---|---|---|---|---|
| CA | 41,271,955 | 32,395,691 | 2,487,800 | 39,538,223 | 1302% | 82% |
| TX | 31,310,252 | 25,160,376 | 5,032,400 | 29,145,505 | 500% | 86% |
| FL | 26,588,019 | 21,979,230 | 2,495,000 | 21,538,187 | 881% | 102% |
| NY | 16,666,217 | 12,001,334 | 931,500 | 20,201,249 | 1288% | 59% |
| PA | 4,011,298 | 3,099,566 | 712,300 | 13,002,700 | 436% | 24% |
| IL | 16,709,715 | 13,064,738 | 825,900 | 12,812,508 | 1582% | 102% |
| OH | 2,665,274 | 2,235,041 | 693,000 | 11,799,448 | 323% | 19% |
| GA | 7,341,959 | 6,265,332 | 1,310,300 | 10,711,908 | 478% | 58% |
| NC | 5,743,409 | 4,648,563 | 1,001,600 | 10,439,388 | 464% | 45% |
| MI | 3,575,537 | 2,958,959 | 470,700 | 10,077,331 | 629% | 29% |
| NJ | 9,902,902 | 7,780,456 | 617,300 | 9,288,994 | 1260% | 84% |

48. For example, in California, the Uninsured Program enrolled 13 times as many uninsured members as there were uninsured people in the entire state. Similarly, in Florida, the Uninsured Program enrolled almost 9 times as many uninsured members as there are unsured people in the state, an amount that even exceeded the entire population of Florida.

49. The data shows that the Uninsured Program became a feeding frenzy for opportunistic and unscrupulous healthcare providers who took advantage of a healthcare crisis and a lack of oversight.

**B. The IBX Claims Data**

50. The data specific to IBX confirms that it was a substantial contributor to this glaring inconsistency between the actual uninsured population and those enrolled in the Uninsured Program.

51. For example, the following chart illustrates several similar serious red flags in the IBX data:

| Fed Tax ID Nbr | Prov Name | Mem Zip | Mem Count | Claim Count | Paid Claim Count | Not Paid Count | COB Count | Total Paid Amount | Census Zip Pop (2022) | Mem Count % as of Zip Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| 845054901 | INFINITY BIOLOGIX | 55111 | 565 | 610 | 610 | - | - | $ 60,900 | 100 | 565% |
| 845054901 | INFINITY BIOLOGIX | 56562 | 267 | 642 | 642 | - | - | $ 62,400 | 502 | 53% |
| 845054901 | INFINITY BIOLOGIX | 55609 | 66 | 105 | 105 | - | - | $ 10,500 | 135 | 49% |
| 845054901 | INFINITY BIOLOGIX | 55802 | 1,023 | 1,600 | 1,595 | 5 | - | $ 158,800 | 2,692 | 38% |
| 845054901 | INFINITY BIOLOGIX | 87731 | 194 | 224 | 224 | - | - | $ 22,400 | 511 | 38% |
| 845054901 | INFINITY BIOLOGIX | 55402 | 251 | 445 | 445 | - | - | $ 42,800 | 709 | 35% |
| 845054901 | INFINITY BIOLOGIX | 55445 | 4,379 | 6,328 | 6,312 | 16 | - | $ 623,000 | 13,459 | 33% |
| 845054901 | INFINITY BIOLOGIX | 55806 | 3,003 | 4,783 | 4,760 | 23 | - | $ 471,200 | 9,269 | 32% |
| 845054901 | INFINITY BIOLOGIX | 55443 | 10,641 | 15,591 | 15,560 | 31 | - | $ 1,541,200 | 32,912 | 32% |
| 845054901 | INFINITY BIOLOGIX | 55114 | 1,099 | 1,753 | 1,750 | 3 | - | $ 174,000 | 3,588 | 31% |
| 845054901 | INFINITY BIOLOGIX | 55812 | 3,480 | 6,786 | 6,771 | 15 | - | $ 667,900 | 11,391 | 31% |
| 845054901 | INFINITY BIOLOGIX | 55805 | 3,009 | 5,183 | 5,175 | 8 | - | $ 512,300 | 10,057 | 30% |
| 845054901 | INFINITY BIOLOGIX | 55808 | 1,565 | 2,182 | 2,177 | 5 | - | $ 216,800 | 5,312 | 29% |
| 845054901 | INFINITY BIOLOGIX | 55429 | 8,208 | 11,428 | 11,397 | 31 | - | $ 1,130,900 | 28,392 | 29% |
| 845054901 | INFINITY BIOLOGIX | 55807 | 2,671 | 3,993 | 3,980 | 13 | - | $ 393,900 | 9,496 | 28% |
| 845054901 | INFINITY BIOLOGIX | 55430 | 6,539 | 9,199 | 9,170 | 29 | - | $ 909,300 | 23,363 | 28% |
| 845054901 | INFINITY BIOLOGIX | 55407 | 10,160 | 16,674 | 16,647 | 27 | - | $ 1,641,600 | 36,897 | 27% |
| 845054901 | INFINITY BIOLOGIX | 55444 | 4,860 | 6,884 | 6,872 | 12 | - | $ 681,600 | 17,716 | 27% |
| 845054901 | INFINITY BIOLOGIX | 55803 | 4,839 | 8,002 | 7,977 | 25 | - | $ 786,200 | 17,734 | 27% |
| 845054901 | INFINITY BIOLOGIX | 55810 | 2,163 | 2,992 | 2,983 | 9 | - | $ 295,600 | 8,028 | 27% |
| 845054901 | INFINITY BIOLOGIX | 55560 | 11,730 | 20,140 | 20,115 | 25 | - | $ 1,983,700 | 43,860 | 27% |
| 845054901 | INFINITY BIOLOGIX | 55804 | 4,157 | 6,842 | 6,818 | 24 | - | $ 670,400 | 16,118 | 26% |
| 845054901 | INFINITY BIOLOGIX | 55425 | 2,761 | 3,747 | 3,733 | 14 | - | $ 371,400 | 10,858 | 25% |
| 845054901 | INFINITY BIOLOGIX | 55811 | 6,956 | 11,118 | 11,087 | 31 | - | $ 1,095,100 | 27,832 | 25% |
| 845054901 | INFINITY BIOLOGIX | 55408 | 8,051 | 13,706 | 13,678 | 28 | - | $ 1,350,100 | 32,312 | 25% |
| 845054901 | INFINITY BIOLOGIX | 55409 | 2,784 | 4,827 | 4,827 | - | - | $ 475,700 | 11,235 | 25% |

52. This chart provides a snapshot of IBX claims data by zip code. The overall data confirms that for over numerous zip codes across the United States IBX's enrolled and billed uninsured members at least double the national percentage for uninsureds.

53. For example, in Moorhead, Minnesota, for the county zip code of 56562, IBX enrolled 267 members, submitted 642 claims, and had all of those claims paid by the Government, for a total of $62,400.

54. According to United States census data, however, the total population for 56562 was only 502. Therefore, IBX enrolled, uninsured members were 50% of the entire population of the zip code.

55. For two zip codes in Brooklyn Park, Minnesota (55443 and 55445), IBX enrolled as uninsured 33% and 32% of the total population, billing the Government over $2.1 million.

56. On its face, this data is impossible. Municipal populations across the county simply are not made up of 30%-50% uninsured. The anomaly becomes even more egregious considering that only 8.4% of the U.S. population is uninsured.

57. The underlying claims data provides the reason for the anomaly. IBX systematically, over the course of the COVID-19 crisis, enrolled fake patients into the portal and billed for those patients repeatedly. The below table illustrates IBX's scheme:

| Fed Tax ID Nbr | Prov Name | Last Name | First Name | Mem Count | Claim Count | Paid Claim Count | Not Paid Count | COB Count | Total Paid Amount |
|---|---|---|---|---|---|---|---|---|---|
| 845054901 | INFINITY BIOLOGIX | [redacted] | | 120 | 215 | 214 | 1 | - | $ 21,100 |
| 845054901 | INFINITY BIOLOGIX | | | 108 | 139 | 139 | - | - | $ 13,900 |
| 845054901 | INFINITY BIOLOGIX | | | 104 | 171 | 170 | 1 | - | $ 16,800 |
| 845054901 | INFINITY BIOLOGIX | | | 95 | 157 | 155 | 2 | - | $ 15,300 |
| 845054901 | INFINITY BIOLOGIX | | | 71 | 93 | 93 | - | - | $ 8,600 |
| 845054901 | INFINITY BIOLOGIX | | | 60 | 69 | 69 | - | - | $ 6,900 |
| 845054901 | INFINITY BIOLOGIX | | | 60 | 87 | 87 | - | - | $ 8,000 |
| 845054901 | INFINITY BIOLOGIX | | | 56 | 85 | 85 | - | - | $ 8,500 |
| 845054901 | INFINITY BIOLOGIX | | | 56 | 80 | 80 | - | - | $ 8,000 |
| 845054901 | INFINITY BIOLOGIX | | | 55 | 82 | 82 | - | - | $ 7,800 |
| 845054901 | INFINITY BIOLOGIX | | | 54 | 68 | 68 | - | - | $ 6,300 |
| 845054901 | INFINITY BIOLOGIX | | | 54 | 65 | 65 | - | - | $ 6,500 |
| 845054901 | INFINITY BIOLOGIX | | | 54 | 67 | 67 | - | - | $ 6,700 |
| 845054901 | INFINITY BIOLOGIX | | | 52 | 65 | 65 | - | - | $ 6,500 |
| 845054901 | INFINITY BIOLOGIX | | | 50 | 99 | 99 | - | - | $ 9,700 |
| 845054901 | INFINITY BIOLOGIX | | | 50 | 75 | 75 | - | - | $ 7,500 |

58. This chart shows the 16 names of patients enrolled in the Uninsured Program who had over 50 identities given to them by IBX. For example, the most billed for patient name in the portal by IBX was [redacted] with 120 different enrollments in the Uninsured Program. According to IBX, it tested those 120 [redacted] 215 times, for which it submitted claims to the Government. Just one of those claims was unpaid (claims were generally rejected because they were duplicated in the system). And, IBX was paid $21,100 over two years for tests purportedly provided to these individuals with this name.

59. Similarly, 108 [redacted] were created and purportedly tested 139 times, 109 [redacted] were tested 171 times, and 95 [redacted] were tested 157 times.

60. For patient [redacted] the following breakdown shows how IBX created these alter egos:

| Fed Tax ID Nbr/ DOB | Paid Claim Count |
|---|---|
| 845054901 | 214 |
| 10/22/2000 | 20 |
| 8/16/1982 | 11 |
| 7/3/1985 | 11 |
| 6/20/1984 | 8 |
| 4/8/1992 | 6 |
| 5/27/1995 | 5 |
| 4/7/1983 | 5 |
| 9/8/1987 | 4 |
| 11/27/1993 | 4 |
| 6/28/1994 | 4 |
| 4/4/1974 | 4 |
| 10/10/1985 | 4 |
| 1/1/1941 | 3 |
| 11/18/1984 | 3 |
| 1/19/1986 | 3 |
| 3/9/1988 | 3 |
| 7/19/1964 | 3 |
| 8/7/1988 | 3 |
| 3/23/1995 | 3 |
| 11/28/1989 | 3 |
| 3/20/1982 | 3 |
| 12/7/1991 | 3 |
| 1/14/1986 | 3 |

61. Thus, according to the data, 20 [redacted] alter egos were created with the birthdate of October 22, 2000, though there does not appear to be anyone by that name born on that day in the United States. Similarly, 11 were created with the birthdates August 16, 1982 and July 3, 1985.

62. A snapshot of the claim-by-claim breakdown highlights a few other problematic billing practices as well. For example, all of the Mai Vangs were from various zip codes but always within Minnesota, always had the same referring physician (Ref. NPI 1609020130), and were both male and female.

| Mem ID | Claim From Dt | Claim Receipt Dt | Pat Code | COB Code | Total Paid Amount | Fed Tax ID Nbr | State | NPI | Rev NPI | Svc ZIP | Mem SSN | Mem Last Nm Mem First Nm | Gender | DOB | Mem Zip | Mem ST | Mem Svc Dt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 558200907 | 1/13/2022 | 2/1/2022 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 558200767 | [redacted] | F | 6/15/1928 | 55125 | MN | 1/26/2022 |
| 162045054 | 11/11/2020 | 3/12/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 162045054 | [redacted] | F | 11/8/1939 | 55110 | MN | 3/9/2021 |
| 162045054 | 11/28/2020 | 3/10/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 162045054 | [redacted] | F | 11/8/1930 | 55119 | MN | 3/9/2021 |
| 162042621 | 11/27/2020 | 3/12/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 162042621 | [redacted] | F | 3/16/1940 | 55309 | MN | 3/9/2021 |
| 585228614 | 1/30/2022 | 2/22/2022 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 585228614 | [redacted] | F | 1/1/1941 | 55106 | MN | 2/16/2022 |
| 585228614 | 2/1/2022 | 2/22/2022 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 585228614 | [redacted] | F | 1/1/1941 | 55106 | MN | 2/16/2022 |
| 585228614 | 2/7/2022 | 2/22/2022 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 585228614 | [redacted] | F | 1/1/1941 | 55106 | MN | 2/18/2022 |
| 162041661 | 12/29/2020 | 3/12/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 162041661 | [redacted] | F | 6/15/1942 | 55119 | MN | 3/9/2021 |
| 46090760 | 4/7/2021 | 8/3/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 46090760 | [redacted] | F | 3/10/1943 | 55069 | MN | 7/30/2021 |
| 599159155 | 11/13/2021 | 12/2/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 599159155 | [redacted] | F | 7/20/1945 | 55443 | MN | 11/30/2021 |
| 475106849 | 3/2/2021 | 9/15/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 475106849 | [redacted] | F | 4/8/1956 | 55144 | MN | 8/3/2021 |
| 162041891 | 11/18/2020 | 3/12/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 162041891 | [redacted] | F | 4/4/1961 | 55119 | MN | 3/9/2021 |
| 52095406 | 11/8/2020 | 9/16/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 52095406 | [redacted] | F | 7/20/1961 | 55130 | MN | 7/30/2021 |
| 504040755 | 11/10/2020 | 8/18/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 504040755 | [redacted] | F | 7/26/1962 | 55079 | MN | 3/24/2021 |
| 656024951 | 11/21/2020 | 2/7/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 656024951 | [redacted] | F | 7/25/1962 | 55079 | MN | 1/16/2021 |
| 126077283 | 3/25/2021 | 6/10/2021 | 1 | 0 | 25 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 126077283 | [redacted] | F | 7/19/1964 | 55430 | MN | 6/6/2021 |
| 126077283 | 3/25/2021 | 6/10/2021 | 1 | 0 | 75 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 126077283 | [redacted] | F | 7/19/1964 | 55430 | MN | 6/6/2021 |
| 505027079 | 12/4/2020 | 1/19/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 0854 | 505027070 | [redacted] | F | 7/19/1964 | 55430 | MN | 1/9/2021 |
| 564209099 | 1/12/2022 | 2/1/2022 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 564209099 | [redacted] | F | 4/4/1965 | 55429 | MN | 1/26/2022 |
| 1196694 | 12/29/2021 | 1/25/2022 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 1192204 | [redacted] | F | 6/14/1965 | 55434 | MN | 1/13/2022 |
| 584225157 | 1/23/2022 | 2/22/2022 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 584225157 | [redacted] | F | 10/12/1966 | 55303 | MN | 2/18/2022 |
| 221021960 | 12/2/2020 | 1/17/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 6854 | 221021960 | [redacted] | F | 8/7/1967 | 55106 | MN | 12/23/2020 |
| 221021960 | 12/22/2020 | 6/3/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 221021960 | [redacted] | F | 8/7/1967 | 55106 | MN | 12/23/2020 |
| 797166793 | 12/11/2021 | 12/23/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 797166793 | [redacted] | F | 12/12/1967 | 55444 | MN | 12/10/2021 |
| 797167017 | 12/7/2021 | 12/23/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 797167017 | [redacted] | F | 2/20/1960 | 55432 | MN | 12/16/2021 |
| 1197401 | 12/22/2021 | 1/26/2022 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 1197402 | [redacted] | F | 8/7/1969 | 55444 | MN | 1/13/2022 |
| 46092101 | 4/27/2021 | 8/3/2021 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 46092108 | [redacted] | F | 10/8/1969 | 55100 | MN | 7/30/2021 |
| 564207769 | 3/3/2022 | 2/1/2022 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 564207780 | [redacted] | M | 10/8/1970 | 55119 | MN | 1/28/2022 |
| 564207780 | 1/10/2022 | 2/1/2022 | 1 | 0 | 100 | 845054901 | MN | 1588276885 | 1609020130 | 55128 | 564207780 | [redacted] | M | 10/8/1970 | 55119 | MN | 1/28/2022 |

63. For several of these examples, an individual was tested several times over the course of a couple of weeks.

64. What is clear from this breathtaking underlying claims data is that IBX billed for patients that do not exist. It created thousands of fictional individuals in order to defraud the Government by giving them different birthdays, genders, and zip codes.

65. IBX's creation of fictional individuals to bill for services not rendered resulted in the submission of false claims to the Government in violation of the FCA.

## III. IBX Damaged the Government Through the Submission of False Claims

66. Between July 2020 and March 2022, IBX billed and received over $124 million from the Uninsured Program.

67. A breakdown by state shows that in Minnesota alone, over the course of that time, IBX billed the Government for over $96 million. In New Jersey, IBX billed and received over $4.5 million from the Uninsured Program.

| Tax ID No | Prov Name | State | Item Count | Claim Count | Paid Claim Count | Not Paid Claim Count | COB Count | Total Paid Amount | Rev Item Count | Rev Claim Count | Rev Paid Claim Count | Rev Not Paid Claim Count | Rev COB Count | Rev Total Paid Amount | Actual Total Paid Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 845054901 | INFINITY BIOLOGIX | MN | 667,057 | 976,363 | 974,747 | 1,616 | - | $ 98,422,900 | 21 | 21 | 21 | - | - | $ (2,100) | $ 98,420,800 |
| 845054901 | INFINITY BIOLOGIX | NM | 49,700 | 132,895 | 132,876 | 19 | - | $ 13,287,500 | 1 | 1 | 1 | - | - | $ (100) | $ 13,287,400 |
| 845054901 | INFINITY BIOLOGIX | NJ | 30,657 | 45,569 | 45,569 | - | - | $ 4,563,900 | 2 | 2 | 2 | - | - | $ (200) | $ 4,563,700 |
| 845054901 | INFINITY BIOLOGIX | TX | 24,452 | 30,297 | 30,293 | 4 | - | $ 3,032,200 | | | | | | $ - | $ 3,032,200 |
| 845054901 | INFINITY BIOLOGIX | VA | 18,314 | 24,474 | 24,289 | 185 | - | $ 2,403,600 | | | | | | $ - | $ 2,403,600 |
| 845054901 | INFINITY BIOLOGIX | ND | 15,468 | 22,130 | 22,046 | 84 | - | $ 2,169,000 | | | | | | $ - | $ 2,169,000 |
| 845054901 | INFINITY BIOLOGIX | GA | 10,757 | 16,733 | 16,698 | 35 | - | $ 1,660,700 | 4 | 6 | 6 | - | - | $ (500) | $ 1,660,200 |
| 845054901 | INFINITY BIOLOGIX | NY | 2,514 | 5,193 | 5,193 | - | - | $ 517,900 | | | | | | $ - | $ 517,900 |
| 845054901 | INFINITY BIOLOGIX | MA | 660 | 3,022 | 3,021 | 1 | - | $ 202,100 | | | | | | $ - | $ 202,100 |
| 845054901 | INFINITY BIOLOGIX | FL | 860 | 1,398 | 1,373 | 25 | - | $ 136,500 | | | | | | $ - | $ 136,500 |
| 845054901 | INFINITY BIOLOGIX | CA | 1,039 | 1,261 | 1,260 | 1 | - | $ 124,900 | 1 | 1 | 1 | - | - | $ (100) | $ 124,800 |

68. Notably, in March 2022, the Government announced that the Uninsured Program would stop accepting claims because it was running out of funds. In that month alone, as shown in the chart below, IBX billed the Government under the Uninsured Program for over $10 million in COVID-19 testing.

| Provider Name byDate | INFINITY BIOLOGIX by Received Date | INFINITY BIOLOGIX by Service Date |
|---|---|---|
| Sum of Total - Paid Amount | $ 124,369,000 | $ 124,066,900 |
| Sum of Feb 2020 - Total Paid Amount | | $ - |
| Sum of Mar 2020 - Total Paid Amount | | $ - |
| Sum of Apr 2020 - Total Paid Amount | | $ - |
| Sum of May 2020 - Total Paid Amount | $ - | $ - |
| Sum of Jun 2020 - Total Paid Amount | $ - | $ - |
| Sum of Jul 2020 - Total Paid Amount | $ - | $ 272,100 |
| Sum of Aug 2020 - Total Paid Amount | $ - | $ 598,400 |
| Sum of Sep 2020 - Total Paid Amount | $ - | $ 836,600 |
| Sum of Oct 2020 - Total Paid Amount | $ - | $ 2,381,700 |
| Sum of Nov 2020 - Total Paid Amount | $ - | $ 18,056,800 |
| Sum of Dec 2020 - Total Paid Amount | $ - | $ 15,810,300 |
| Sum of Jan 2021 - Total Paid Amount | $ 5,589,400 | $ 10,187,100 |
| Sum of Feb 2021 - Total Paid Amount | $ 1,771,400 | $ 7,682,700 |
| Sum of Mar 2021 - Total Paid Amount | $ 15,177,700 | $ 9,314,400 |
| Sum of Apr 2021 - Total Paid Amount | $ 6,737,200 | $ 7,867,600 |
| Sum of May 2021 - Total Paid Amount | $ 1,514,300 | $ 4,394,800 |
| Sum of Jun 2021 - Total Paid Amount | $ 5,801,500 | $ 1,717,900 |
| Sum of Jul 2021 - Total Paid Amount | $ 10,850,700 | $ 1,493,800 |
| Sum of Aug 2021 - Total Paid Amount | $ 18,883,600 | $ 4,323,300 |
| Sum of Sep 2021 - Total Paid Amount | $ 11,097,400 | $ 7,584,000 |
| Sum of Oct 2021 - Total Paid Amount | $ 6,924,400 | $ 7,478,500 |
| Sum of Nov 2021 - Total Paid Amount | $ 7,811,200 | $ 6,000,200 |
| Sum of Dec 2021 - Total Paid Amount | $ 7,274,800 | $ 6,320,000 |
| Sum of Jan 2022 - Total Paid Amount | $ 5,135,900 | $ 8,840,000 |
| Sum of Feb 2022 - Total Paid Amount | $ 9,288,600 | $ 2,315,900 |
| Sum of Mar 2022 - Total Paid Amount | $ 10,510,900 | $ 590,900 |
| Sum of Apr 2022 - Total Paid Amount | $ - | |

69. It appears that, following the Government's announcement that it would be terminating the Uninsured Program because it was running out of money, IBX sought to squeeze

every last dollar out of the Uninsured Program before it dried out. Unfortunately, the Uninsured Program dried out due to opportunistic providers and labs, like IBX, to the direct detriment of uninsured patients who relied on the program.

**COUNT I**
**False Claims Act: Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)**

70. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

71. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant has "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" in violation of 31 U.S.C. § 3729(a)(1).

72. As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000[1] for each and every violation of 31 U.S.C. § 3729 arising from Defendant's unlawful conduct as described herein.

**COUNT II**
**False Claims Act: Making or Using A False Record**
**or Statement to Cause Claim to be Paid 31 U.S.C. § 3729(a)(2)**

73. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

74. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendant has "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement – *i.e.*, the false certifications and representations made or caused to be

---

[1] A 2015 amendment to the False Claims Act authorized the U.S. Department of Justice to periodically inflation-adjust these penalties. Effective May 9, 2022, the minimum penalty is $12,537 and the maximum is $25,076.

made by the defendant – to get a false or fraudulent claim paid or approved by the Government" in violation of 31 U.S.C. § 3729(a)(2).

75. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendant's unlawful conduct as described herein.

**COUNT III**
**False Claims Act: Retaining Overpayment 31 U.S.C. § 3729(a)(I)(G)**

76. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

77. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendant has "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowing conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government" in violation of 31 U.S.C. § 3729(a)(l).

78. As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be detem1ined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendant's unlawful conduct as described herein.

**PRAYER**

WHEREFORE, Relator, on behalf of the United States, respectfully request that:

a. This Court enter an order determining that Defendant violated the FCA by making false statements and records to cause false claims to be submitted to the United States;

b. This Court enter an order requiring Defendant to pay treble damages and the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

c. This Court enter an order requiring Defendant to pay all expenses and attorney's fees and costs associated with this action;

d. This Court enter an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

e. For pre- and post-judgment interests, costs, and any and all other relief as this Court determines to be reasonable and just.

**JURY DEMAND**

Pursuant to Federal Rules of Civil Procedure 38, Realtors request a trial by jury.

Dated: November 5, 2024

**SPIRO HARRISON & NELSON**

By: ______________________
David B. Harrison, Esq.
Allie Martinez, Esq.
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
(973) 744-2100
dharrison@shnlegal.com
amartinez@shnlegal.com

*Counsel for Plaintiff-Relator*